# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| CARL CASTETTER, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CAUSE NO.: 1:17-CV-227-TLS |
| DOLGENCORP, LLC, | ) ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter comes before the Court on Defendant Dolgencorp, LLC's (more commonly known as "Dollar General") Motion for Summary Judgment [ECF No. 31]. The Plaintiff, Carl Castetter, filed a response [ECF No. 38] on October 26, 2018. On November 14, 2018, the Defendant filed a reply [ECF No. 42] in further support of its Motion for Summary Judgment.

## STATEMENT OF FACTS

The parties' dispute centers on whether Dollar General violated the Americans with Disability Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, when it terminated Castetter from its employ on May 2016.

### A. Start of Castetter's Employment with Dollar General and Cancer Diagnosis

Castetter began working for Dollar General in September 2013 as a district manager in the Detroit, Michigan area, where he oversaw the operations of sixteen stores. As district manager, Castetter's job responsibilities principally involved managing the stores and store managers located in his district. This included recruiting, training, and onboarding store managers in his district. Importantly, Dollar General tasks district managers with ensuring that employees within their district properly complete all employment paperwork and background

checks before starting their employment. This responsibility is a critical one for district managers, especially in situations where an employee is to be assigned to a store that does not have a store manager—a common situation due to high turnover.

On January 30, 2014, four months after starting with Dollar General, Castetter was diagnosed with colon cancer. Shortly thereafter, Michael Turner, the regional manager overseeing Castetter's district, placed Castetter on medical leave. Castetter underwent treatment throughout 2014, including chemotherapy and surgery. He notified Dollar General that he would be ready to report back to work in early August 2014.

Dollar General informed Castetter that Mark Hubbs, the Regional Manager covering Northern Indiana, had a District Manager position available in Gary, Indiana. Subsequently, two months after undergoing surgery for colon cancer, Castetter interviewed with Hubbs for the position. Castetter testified during his deposition that Hubbs said to him that he was "surprised" that Castetter was even at the interview because he knew three people "who had what [Castetter] had and they are all dead." (Castetter Dep. 155-56, ECF No. 39-1.) Moreover, Castetter testified that Hubbs asked him why he would go to a "tough market" like Gary right after his surgery. (*Id.* at 156.). Castetter did not hear back from Hubbs about the Gary position, and instead resumed working for Turner in Michigan.

**B.      Castetter Becomes District Manager in Fort Wayne**

In November 2014, Castetter filled a vacant position for District Manager in the Fort Wayne area. When he initially arrived in Fort Wayne, Castetter reported to Regional Manager Mark Hubbs. In March 2015, Hubbs was temporarily reassigned to Louisville, Kentucky. During Hubbs' temporary reassignment, one of the other district managers reporting to Hubbs in Northern Indiana, Jerry Chupp, became Temporary Regional Director of Northern Indiana.

Soon after Castetter began reporting to Chupp, he started to undergo treatment for liver cancer, which was discovered in January 2015. According to Castetter, Chupp knew of his condition and expressed annoyance when Castetter suggested hiring additional employees to service the Fort Wayne stores. Castetter also described a situation in July 2015, where Chupp instructed Castetter to find a missing GPS device that had been misplaced at one of Castetter's stores. When an employee notified Chupp that the GPS device had been located, Chupp asked her not to tell Castetter. Finally, Castetter also testified that Chupp would attempt to surveil Castetter without his knowledge and visit stores in Castetter's district without advance notice, which according to Castetter, deviates from common "business courtesy." (Castetter Dep. at 179.)

In August 2015, Dollar General placed Castetter on a Performance Improvement Plan ("PIP"). Dollar General justified placing Castetter on PIP based on his overall management of his district as well as his hostile communication style with his staff. In turn, Castetter wrote a six-page letter to Hubbs lodging various complaints against Chupp.[1] In general terms, Castetter's letter included concerns with Chupp's management style, the GPS incident, and the lack of justification for placing him on PIP. Castetter did not reference his cancer diagnosis or any allegation of discrimination in the letter.

C.      **Hubbs' Return to the Northern Indiana Region**

Hubbs returned to the regional manager position in Northern Indiana in December 2015, at which time Castetter was undergoing regular treatment for liver cancer. Castetter testified about a situation shortly after Hubbs' return where Hubbs mocked and demeaned him. In one instance, Hubbs made Castetter get on his hands and knees to straighten cans that were a quarter

---

[1] Hubbs testified during his deposition that he did not recall receiving the letter. (*See* Hubbs Dep. at 69, ECF No. 33-24.)

3

of an inch from the edge of the shelf at a particular store in his district. During his deposition, Castetter recounted Hubbs saying: "I am going to sit here in a lounge chair and watch you work until you will drop." (Castetter Dep. at 282.)

In early 2016, Hubbs conducted a meeting with store managers who reported to Castetter. According to Castetter, Hubbs chose to conduct the meeting when he did because he knew Castetter would be unable to attend as he would be undergoing a microwave ablation procedure during that time. On January 7, 2016, after the meeting, Hubbs issued a Final Written Counseling to Castetter. The Final Written Counseling was based on employee feedback as a part of a 360-degree review of Castetter. The review uncovered reports of an unprofessional discussion Castetter had with a store manager about the preparation of inventory. According to Castetter, he disputed raising his voice to any store manager, and Hubbs accepted Castetter's explanation. At that point, Castetter asked Hubbs whether he was looking for a reason to fire him—a question to which Hubbs did not respond.

Hubbs' criticism of Castetter continued to intensify. For example, after Castetter informed Hubbs that he found stores he visited outside of Fort Wayne but within Hubbs' region to be inferior to stores within his district, Hubbs told Castetter to stop visiting stores outside his district. Hubbs had previously told Castetter to write a list of the "seven rules of the sky shelves." (Castetter Dep. at 282.) When Castetter handed the list to Hubbs at Hubbs' request, "[Hubbs] snatched it out of [Castetter's] hand crumpled it up and threw it on the floor and walked away and came back and got in [Castetter's] face." (*Id*.) Later, in March 2016, Hubbs asked Castetter about the progress of his cancer treatment. Castetter responded that doctors could no longer detect cancer in his body. Hubbs responded to the news that Castetter was free of cancer by

4

saying: "So that's it? You are done?" (Castetter Dep. at 281.) Instead of congratulating Castetter, Hubbs forced Castetter to do manual labor the next day.

**D.     Human Resources Investigation**

In April 2016, Sarah Price, Regional Human Resources Manager for Northern Indiana, visited Hubbs' region to investigate store manager turnover and noncompliance with company training requirements. Price emailed Human Resources Director Lori Bremer on April 27, 2016, to report that turnover in Castetter's district was "terrible" and that "the list goes on" with respect to other failures in meeting performance benchmarks. (Castetter Dep. Ex. 37 at 3, ECF No. 33-17 at 4.) For example, Price noted that computer-based learning and training compliance in Castetter's district was 82% when Dollar General's goal was 90%. Price also referenced a situation where Castetter failed to detect a cash discrepancy issue in one of his stores.

Bremer responded to Price's email, writing that the issues Price cited were not enough to terminate Castetter; instead, Bremer requested a copy of Castetter's earlier PIP. Price emailed the previous PIP from early 2016, noting that store manager turnover was at 89%, critical staffing was at 53%, and computer-based learning was at 82%. After reviewing Price's emails, on April 28, 2016, Bremer recommended that Castetter be placed on a PIP.

**E.     Store 11147 on Bluffton Road and Termination**

One store in Castetter's district burdened with consistent policy violations was Store 11147 located on Bluffton Road. While attending an employee's meeting in Hubbs' region, Price met Nakiea Morales, an individual who had applied for a store manager position at Store 11147. Castetter had recruited Morales for the store manager position and invited her to the meeting. Price, however, learned that Morales was in fact an unpaid, non-employee at Dollar General as her Employment Eligibility Verification Form and USCIS Form I-9 were not completed. Price

spoke with Castetter to inform him that it was a violation of company policy for an unpaid, non-employee to attend an employee meeting and instructed Castetter to process Morales' employment documents. Castetter attempted to delegate the task of properly onboarding Morales to Kathy Tracy, a store manager from a different store within his district. Ultimately, Price processed Morales' employment documents herself and officially hired Morales.

On April 29, 2016, Price emailed Bremer to inform her about another employee, Eric Hayes, who was working in Store 11147 without completing the company's onboarding process. Although Hayes had access to keys, safe codes, and alarm codes at Store 11147, he did not undergo the required background or drug checks. Furthermore, Hayes began working on April 13, 2016, but his I-9 was not completed until April 29, 2016. Therefore, Hayes worked at Dollar General for more than three weeks without an employee identification number and without pay. Eventually, Hayes was terminated from Dollar General for stealing food from the store, which he did because Dollar General failed to pay him. During her deposition, Price testified that there were other employees who Castetter hired but who did not have their I-9s processed and who were not paid. (*See* Price Dep. at 18, ECF No. 33-25.)

On May 3, 2016, when Price and Hubbs interviewed Castetter about issues with individuals working at Store 11147 without having their employment documents processed and background checks performed, Castetter explained that he had delegated hiring responsibilities for Store 11147 to Tracy. After Castetter's interview, Price and Hubbs sought a statement from Tracy to understand the direction she received from Castetter. Tracy informed Price and Hubbs that Castetter knew that Tracy could not process I-9s for employees assigned to Store 11147 and also reminded Castetter of the need to have Morales' I-9 processed. After reviewing Tracy's statement, Bremer emailed Price and Hubbs on May 3, 2016, to tell them that she supported

terminating Castetter's employment. The next day, Hubbs met with Castetter to inform him that he was being terminated from Dollar General for violating the company's wage and hours policies and failing to protect company assets.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Additionally, a court is not "obliged to research and

construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

## ANALYSIS

The ADA prohibits employers from discriminating against a "qualified individual" on the basis of his disability. 42 U.S.C. § 12112(a). To prove a claim of disability discrimination, Castetter "must show that: (1) he is disabled; (2) he is otherwise qualified to perform essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (citing *Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016)). The ADA requires proof of "but for" causation to satisfy the third element. *See A.H.ex rel. Holzmueller v. Ill. High Sch. Assoc.*, 881 F.3d 587, 593 (7th Cir. 2018). For the sake of efficiency and because the parties devote the vast majority of their briefing to the issue, the Court will focus its analysis on whether Dollar General terminated Castetter because of his disability—the ADA's third element.

Discrimination claims may be reviewed on summary judgment under the direct or burden-shifting methodologies. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). When a plaintiff responds to a motion for summary judgment on an intentional discrimination claim by relying on the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a court should assess the case in those terms. *David*, 846 F.3d at 224; *see also Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (noting that the *McDonnell Douglas* burden shifting analysis was not been displaced by *Ortiz v. Werner Enters. Inc.*, 834 F.3d 760 (7th Cir. 2016)). When the plaintiff does not present his argument in opposition to summary judgment in those terms, the direct

method of proof is the "default rule." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 880 (7th Cir. 2016) (quoting *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013)). Under that method, the test for whether a claim of disability discrimination should proceed to a jury is whether the admissible evidence, considered as a whole, would permit a reasonable factfinder to conclude that the plaintiff's disability caused the adverse action. *See Ortiz*, 834 F.3d at 765 (setting out the standard for avoiding summary judgment on a discrimination claim under the direct method of proof). In all cases, the question at summary judgment remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224 (citing *Morgan*, 724 F.3d at 997); *see also Liu v. Cook County*, 817 F.3d 307, 315 (7th Cir. 2016) ("The proper question under either method is simply whether a reasonable trier of fact could infer retaliation or discrimination."); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014) ("[T]he fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination.").

Although not expressed by Castetter in the clearest of terms in his opposition brief, the Court understands that Castetter has not invoked the *McDonnell Douglas* burden-shifting method to refute summary judgment. (*See* Resp. 20.) To defeat summary judgment then, Castetter must present evidence that would permit a reasonable jury to find that Dollar General took adverse action against him because of his disability. *See Monroe*, 871 F.3d at 504.

Castetter puts forth four categories of evidence to persuade this Court that a reasonable jury could find that Dollar General terminated his employment because of his disability. The categories of evidence are: (1) comments from supervisors demonstrating discriminatory animus; (2) disparate treatment of employees; (3) pretextual justification for termination; and (4)

suspicious timing of certain adverse employment decisions. After reviewing Castetter's arguments and evidence in support, this Court finds that a reasonable factfinder could not conclude that Castetter's employment was terminated due to his disability.

**A.     Comments from Supervisors**

Castetter argues that Hubbs' repeated denigrating comments about his cancer diagnosis combined with the threat to watch him work "until he dropped" reveals that Hubbs was motivated by a discriminatory animus when Hubbs took part in the decision to terminate his employment. Castetter cites several cases in support of the principle that discriminatory comments from someone who influenced the decision to terminate is evidence from which a jury could determine that an adverse employment decision was based on a disability or on some other illegitimate grounds. (Resp. at 21–22.) Castetter, however, fails to consider that the same cases he cites make clear that for discriminatory comments to be probative of whether an adverse employment decision was based on some discriminatory motive, the comments should be contemporaneous with the employee's discharge, causally related to the decision to discharge, or show a propensity to evaluate employees on some impermissible basis.

One case Castetter cites, *Hasan v. Foley & Lardner LLP*, 552 F.3d 520 (7th Cir. 2008), is distinguishable from the instant case. The plaintiff in *Hasan* brought a Title VII suit against the law firm of Foley & Lardner, where he was an associate, for firing him on the basis of his religion and race. *See id.* at 522. The Seventh Circuit reversed the district court's grant of summary judgment in favor of the law firm because it found that the discriminatory comments in question were uttered during a partner meeting where it was decided to terminate the plaintiff. *Id.* at 531. At the meeting, the partners discussed the plaintiff's religion and race in ultimately deciding to terminate the plaintiff, a Muslim of Indian descent. *Id.* at 528. One partner present at

the meeting described the discussion about the plaintiff as a "sand n***** pile-on." *Id.* Moreover, one of the partners present at the meeting had commented a year earlier: "[T]hose people don't belong here . . . they should kick them all out." *Id.* at 523. A partner who overheard the comment testified that the comment was in reference to Muslims. *Id.* The Seventh Circuit found the comment probative of the firm's discriminatory intent because the comment related to the tendency of someone with influence over the decision-making process to evaluate employees based on religion and race. *Id.* at 528. Contrastingly, Castetter presents (1) no evidence that Hubbs' comments were contemporaneous with the decision to fire Castetter; (2) no evidence that Hubbs' comments were connected to any discussion or decision to terminate him; and (3) no explanation for how the comments demonstrate Hubbs' tendency to evaluate employees on impermissible grounds, such as an employee's disability.

Castetter also cites *Sheehan v. Donlen Corp.*, 173 F.3d 1039 (7th Cir. 1999), to support his argument that Hubbs commenting that he would watch Castetter work until he dropped reflected a propensity to evaluate employees based on illegal criteria. Nevertheless, it is unclear how the isolated comments in this case demonstrate Hubbs' propensity to evaluate based on illegal criteria like those the Seventh Circuit found in *Sheehan*. In *Sheehan*, a supervisor made a series of comments during the plaintiff's pregnancies, suggesting that the supervisor counted the plaintiff's pregnancies against her in his evaluations and that her pregnancies were the reason for her termination. *Id.* at 1042. For example, during one of the plaintiff's pregnancies, her supervisor expressed concern over how the plaintiff's work would be completed while she was on maternity leave. *Id.* When the plaintiff returned from maternity leave, the supervisor said, "if you have another baby, I'll invite you to stay home." *Id.* Finally, after the plaintiff notified her supervisor of her third pregnancy, he said, "Gina [the plaintiff], you're not coming back after this

11

baby." *Id.* Thus, the comments in question were evidence that the plaintiff's pregnancies were counted against her and were the reason behind her termination. *Id.* Castetter has presented no such linkage between Hubbs' comments and the decision to terminate him.[2]

The comments involved in *Geier v. Medtronic, Inc.*, 99 F.3d 238 (7th Cir. 1996), are more analogous to Hubbs' comments than those involved in the cases cited by Castetter. In *Geier*, the Seventh Circuit found that a supervisor's denigrating comments about the plaintiff's pregnancy did not evidence a discriminatory intent behind the employer's decision to terminate the plaintiff. *Id.* at 243. The plaintiff's supervisor said to the plaintiff: "Have all the kids you would like—between, spring, summer, and fall. I will not work your territory during the winter months." *Id.* at 242. Furthermore, shortly after the plaintiff's miscarriage, her supervisor called the her to say "get out of your G*d d*mn bed and call your accounts if you want to keep your f****** job." *Id.* The plaintiff's employer terminated her after the plaintiff failed to meet certain performance metrics. *Id.* The Seventh Circuit found that, despite the employer's "excessively insensitive" and "unconscionable" remarks, the plaintiff failed to meet the requisite showing of discriminatory intent because she did not present evidence showing the "causal nexus between the remark[s] and decision to discharge." *Id.*

Hubbs' comments closely resemble the comments in question in *Geier*. In both instances, a supervisor made derogatory comments and forced an employee to work in their weakened

---

[2] Castetter also cites *Lewis v. City of Chicago*, 496 F.3d 645 (7th Cir. 2007), and *Hunt v. City of Markham*, 219 F.3d 649 (7th Cir. 2000). Nevertheless, the comments in these cases, like the comments in *Hasan* and *Sheehan*, related directly to the decision to take the adverse employment action, and, therefore, are distinguishable from the case at hand. In *Lewis*, a supervisor commented to a female officer that she was being denied a training opportunity, the adverse employment action, because, as a female, she would be safer if she did not participate. *Lewis*, 496 F.3d at 651. In *Hunt*, white officers were able to show that their discharges were the result of discriminatory animus because the mayor commented that the city needed to "get rid of all the old white officers" and asked "when are you [white officers] going to quit so we can bring these young black men up?" *Hunt*, 219 F.3d at 652. In these cases, the discriminatory comments were made in connection with the adverse employment action—a connection missing between Hubbs' comments and the decision to terminate Castetter.

physical condition but neither the plaintiff in *Geier* or in this case put forth evidence demonstrating that the comments in question were contemporaneous with the decision to discharge or related to the motivation to discharge. Consequently, like in *Geier*, this Court finds that Hubbs' comments, even viewed in the light most favorable to Castetter, do not reveal a discriminatory intent behind the decision to terminate Castetter.

**B.      Disparate Treatment of Employees**

Castetter next points the Court to Jerry Chupp and Kathy Tracy as comparators who also violated company policies but were not terminated, which Castetter argues is indicative of Dollar General's purported discriminatory intent in terminating Castetter. According to Castetter, his letter to Hubbs regarding Chupp's management of the Northern Indiana region should have triggered some adverse employment action against Chupp. Similarly, Castetter contends that the company should have disciplined Tracy for hiring Morales and Hayes without processing their respective I-9s, the same conduct for which Castetter was terminated.

"[E]vidence, whether or not rigorously statistical, that similarly-situated employees outside the protected class received systematically better treatment" may permit a reasonable factfinder to conclude that Dollar General dismissed Castetter because of his cancer diagnosis. *See Tank v. T-Mobile, USA, Inc.*, 758 F.3d 800, 805 (7th Cir. 2014). For Castetter's offered comparators to be relevant to whether Dollar General terminated Castetter because of his disability, Castetter must address whether Chupp and Tracy "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018) (citing *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

Dollar General's decision not to discipline Chupp after Castetter's letter is not a proper comparison to Dollar General's decision to terminate Castetter because the conduct alleged in Castetter's letter, even if true, was not similar to the conduct for which Castetter was terminated. Castetter's letter complained about Chupp's management of the Northern Indiana region and about Chupp placing Castetter on PIP without sufficient justification. In contrast, Dollar General terminated Castetter for violations concerning compliance with processing employment documents and providing key authorizations to individuals without performing the proper background checks. Hence, Chupp is not a proper comparator because he did not engage in the type of conduct that led to Castetter's dismissal.

Tracy is also not an appropriate comparator to demonstrate that Dollar General was motivated by some discriminatory intent in terminating Castetter. The Seventh Circuit has held that an employer may hold subordinate employees to a different standard than higher-ranking employees without running afoul of discrimination laws. *See Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009) ("[The employer] was entitled to hold lower-ranking employees to lower standards than those it applied to [a higher-ranking employee]."). As a store manager in Castetter's district, Tracy was in a subordinate position in relation to Castetter. Therefore, Tracy is not a proper comparator as Dollar General was entitled to terminate Castetter, a district manager, and not take adverse employment action against Tracy, a store manager, for the same conduct in violation of company policy.

**C.     Pretext**

Castetter contends that the reason provided for his termination was pretextual. "[E]vidence that the employer offered a pretextual reason for an adverse employment action" is probative of whether an employer terminated an employee on discriminatory grounds. *Tank v. T-*

*Mobile USA, Inc.*, 758 F.3d 800, 805 (7th Cir. 2014) (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014)). The "focus of the pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 785 (7th Cir. 2004) (quoting *Stewart v. Henderson*, 207 F.3d 374 (7th Cir. 2000)). "[T]he question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason *was* his reason: not a good reason, but the true reason." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006).

In his briefing, Castetter repurposes his comparator argument for the pretext inquiry. The Court understands Castetter to argue that Dollar General not taking adverse employment action against Chupp and Tracy but terminating Castetter, necessarily indicates that Dollar General's reason for terminating Castetter was not honest. As explained above, (1) Chupp did not engage in similar conduct to that for which Castetter was terminated, and (2) Dollar General was entitled to take adverse action against Castetter without taking similar action against Tracy, his subordinate, for the same conduct. Other than his recycled comparator argument, Castetter provides no explanation for how the decision to fire him over his failure to process employment documents and ensure compliance with the company's key authorization policies was pretextual.

D. **Suspicious Timing**

Castetter argues that the timing of certain adverse employment decisions was suspicious and, therefore, evidence of Dollar General's discriminatory intent in terminating his employment. Although suspicious timing is evidence a factfinder can properly consider to find discrimination in the employment context, a "temporal sequence is not a magic formula which results in a finding of discriminatory cause." *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506 (7th

15

Cir. 2004) (quoting *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1034 (7th Cir. 1999)). At the summary judgment stage, "suspicious timing alone is almost always insufficient to survive summary judgment." *Leitgen v. Franciscan Skemp. Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011).

Castetter references two instances to support his suspicious timing argument. First, on April 28, 2015, the same day as his first radiation treatment for liver cancer, Chupp began moving Castetter's employees to different stores without first consulting Castetter. Second, on January 7, 2016, Hubbs presented Castetter with a Final Written Counseling three days after Castetter had the microwave ablation procedure to treat his liver cancer.

This Court finds that the timing of the employment decisions Castetter references are not suspicious even when examined in the light most favorable to Castetter. Castetter had fifteen medical appointments and procedures in 2015 alone and several appointments and procedures in 2016. Consequently, it would not be suspicious that Castetter experienced what he would characterize as adverse employment decisions at some point in temporal proximity to a medical procedure or appointment. Thus, Castetter cannot overcome the general rule that suspicious timing is insufficient to support a claim for employment discrimination.

For the reasons stated above, Castetter has not presented evidence that would permit a reasonable factfinder to conclude that Dollar General terminated his employment because of his disability. Accordingly, as Castetter fails to make the requisite showing with respect to the third element of an ADA claim, his ADA claim cannot survive summary judgment.

## CONCLUSION

For these reasons, the Court GRANTS the Defendant's Motion for Summary Judgment [ECF No. 31]. The Clerk will enter judgment in favor of the Defendant and against the Plaintiff.

SO ORDERED on April 29, 2019.

                                               s/ Theresa L. Springmann
                                               CHIEF JUDGE THERESA L. SPRINGMANN
                                               UNITED STATES DISTRICT COURT